Michelle Elieen BELL, Appellant,

v.

STATE of Texas, State.

No. 2–87–001–CR.

Court of Appeals of Texas,
Fort Worth.

March 10, 1988.

Law Offices of Strickland, Moore & Moore, and Pamela J. Moore, Fort Worth, for appellant.

Tim Curry, Dist. Atty., and Delonia A. Watson, Asst. Dist. Atty., Fort Worth, for appellee.

Before HILL, FARRIS and KELTNER, JJ.

## OPINION

FARRIS, Judge.

Appellant, Michelle Elieen Bell, was convicted by a jury of involuntary manslaugh-

ter. *See* TEX.PENAL CODE ANN. sec. 19.05(a)(1) (Vernon 1974). The victim in this case was killed by the combination of drugs contained in the "Mickey Finn" (or incapacitating drug) administered to him by appellant and an accomplice in order to allow them to steal his possessions. The jury also answered "true" to an enhancement count for a prior felony conviction of credit card abuse and assessed punishment at twenty years imprisonment and a $10,000 fine. Appellant raises twelve points of error on appeal attacking the sufficiency of the evidence; the admissibility of a confession made by appellant subsequent to her arrest; the failure of the trial court to charge the jury on the lesser included offense of theft; and references to extraneous offenses during the course of the trial. We overrule all of appellant's points and affirm her conviction.

On February 16, 1986, appellant and an accomplice, Sharon Black, became acquainted with the deceased, John Knopp, Jr., at a nightclub in Arlington, Texas. At some time between 1:45 a.m. and 2:00 a.m. in the morning, the deceased left the club in the company of appellant and Black. The three drove to a local motel, where the deceased rented a room.

Once in the room, Black took a beer into the dressing area near the bathroom. She added a "mickey," a drug that would render the deceased unconscious, to the beer. She then gave the drugged beer to the deceased, who drank it and lost consciousness. The two women left the room after removing the victim's jewelry.

At some point, the deceased died of respiratory arrest caused by the combination of three drugs: Lorazepam, Triazolam, and alcohol. Appellant and Black were arrested in Amarillo, Texas in possession of the deceased's jewelry and two rolled up papers containing a powdered form of the drug Triazolam.

In her first two points of error, appellant contends that the evidence was insufficient to sustain a guilty verdict, and that the trial court improperly denied her request for an instructed verdict of acquittal. More specifically, appellant contends that the evidence failed to show that Lorazepam was administered to the deceased by the two women.

■ In reviewing the sufficiency of the evidence in either a direct or circumstantial evidence case, we must view the evidence in the light most favorable to the prosecution and consider whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. State,* 672 S.W.2d 801, 803 (Tex.Crim.App.1984); *Houston v. State,* 663 S.W.2d 455, 456 (Tex.Crim.App. 1984); *Wilson v. State,* 654 S.W.2d 465, 471 (Tex.Crim.App.1983) (opinion on reh'g). A conviction cannot be sustained if the evidence leaves any reasonable doubt as to the guilt of the accused. *Jackson v. Virginia,* 443 U.S. 307, 317–18, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560, 572–73 (1979). Thus, it follows that a conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt of the defendant. *Johnson v. State,* 673 S.W.2d 190, 195 (Tex.Crim.App.1984); *Jackson,* 672 S.W.2d at 803.

■ Dr. Marc Krouse, Deputy Chief Medical Examiner for Tarrant County, conducted the autopsy on the deceased. He testified that the cause of death was respiratory failure brought on by acute mixed drug intoxication. He testified that the particular substances contributing to the victim's death were Lorazepam, Triazolam and ethanol alcohol. Dr. Krouse testified that the level of Lorazepam was sufficient to be considered toxic, and that the level of Triazolam found was life-threatening. His conclusions as to the levels of Lorezepam and Triazolam were based on a toxicology lab report performed at his request.

Appellant admitted in a statement made after her arrest and introduced into evidence at the trial, that Black had put some kind of drug in the deceased's beer. She also stated that she did not know what the

drug was. Her statement also said that after the deceased had lost consciousness, Black disposed of the beer bottle and the cup from which the deceased drank.

Arlington Police Detective Jim Ford testified about the Triazolam found in the possession of appellant and Black. He testified that Black told him that she originally possessed three such packets of powder and had used one of them on the deceased.

The evidence that the "mickey" given to the deceased contained Lorazepam is admittedly circumstantial in nature. However, in circumstantial evidence cases it is not necessary that every fact point directly and independently to the defendant's guilt. The evidence is sufficient if the conclusion is warranted by a combined and cumulative force of all the incriminating evidence. In other words,

> [i]t is not required that the circumstances should, to a moral certainty, actually exclude every hypothesis that the act may have been committed by another person, but that the hypothesis is a reasonable one consistent with the circumstances and the facts proved.

*Carlsen v. State*, 654 S.W.2d 444, 447 (Tex. Crim.App.1983).

A conviction for involuntary manslaughter requires that the finder of fact find that the accused recklessly caused the death of an individual. *See* TEX.PENAL CODE ANN. sec. 19.05(a)(1) (Vernon 1974). We believe that the evidence introduced at trial was such that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Appellant's first two points of error are overruled.

In her third and fourth points, appellant contends that the statement she made subsequent to her arrest was improperly admitted into evidence over her motion to suppress because the affidavit supporting the arrest warrant was insufficient to show probable cause.

■ Both the United States and Texas constitutions provide that an arrest warrant must be based on probable cause supported by oath or affirmation. *See* U.S. CONST. amend. IV; TEX.CONST. art. I, sec. 9. In order to support an arrest warrant, the affidavit must show first of all probable cause that an offense has been committed, and second, probable cause that the person named therein committed the offense. *See* TEX.CODE CRIM.PROC. ANN. art. 15.05 (Vernon 1977).

■ In determining whether the affidavit is sufficient to show probable cause, we are limited to the four corners of the affidavit itself. *Lopez v. State*, 535 S.W.2d 643, 647 (Tex.Crim.App.1976). The test is whether the affidavit provides a neutral and detached magistrate with sufficient information to support an independent judgment that probable cause exists for the warrant. *Jones v. State*, 568 S.W.2d 847, 854 (Tex.Crim.App.) (en banc), *cert. denied,* 439 U.S. 959, 99 S.Ct. 363, 58 L.Ed.2d 352 (1978).

The affidavit was sworn by Detective Jim Ford of the Arlington Police Department. He stated that he had good reason to believe that appellant and Black committed the offense of theft from a person. The affidavit recites that Ford was investigating a death at the motel. Ford found the body of the deceased lying on the bed in the motel room. He interviewed a security guard who stated that he saw the deceased check into the motel in the company of two women. Ford also interviewed Richard Allen Sutton, an acquaintance of the deceased. Sutton was at the nightclub in the company of the deceased when he left with appellant and Black, and was able to describe the jewelry the deceased was wearing when he left the nightclub. The investigation at the scene of death revealed no sign of the jewelry.

The affidavit also states that Ford checked the Dallas Police Department intelligence files for known offenders suspected of committing "Mickey Finn" thefts. He obtained photographs of appellant and Black from the files. After placing each photograph in a separate lineup, he showed

them to Sutton and the security guard. Both witnesses positively identified appellant and Black as the women they had seen in the company of the deceased.

■ We are obliged to interpret the affidavit in a common sense and realistic manner, and we must also consider the inferences which the magistrate could have drawn from the facts contained in it. *See Jones*, 568 S.W.2d at 854. The cumulative weight of these facts is sufficient to show probable cause that the offense of theft had been committed and that appellant had committed it. The statement given by appellant was subsequent to a lawful arrest adequately supported by probable cause. We overrule appellant's third and fourth points of error.

■ Appellant maintains in her fifth point that the trial court should have charged the jury on theft from the person as a lesser included offense of murder. Under the facts of this case, we find that no such charge was required.

TEX.CODE CRIM.PROC.ANN. art. 37.-09 (Vernon 1981), states that an offense is a lesser included offense if:

(1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

(2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

(3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

(4) it consists of an attempt to commit the offense charged or an otherwise included offense.

*Id.*

The determination of whether an offense is a lesser included offense of the offense charged is made on a case by case basis. *See Day v. State*, 532 S.W.2d 302, 315–16

(Tex.Crim.App.1975) (opinion on reh'g). The mere fact that it was incumbent on the State to prove that appellant committed an act dangerous to human life while in the course of committing theft does not make theft a lesser included offense. *See, e.g., Woodkins v. State*, 542 S.W.2d 855, 858 (Tex.Crim.App.1976). However, the test is whether the State's case was presented to prove the offense charged included proof of the underlying felony. *See Broussard v. State*, 642 S.W.2d 171, 173 (Tex.Crim. App.1982); *Eldred v. State*, 578 S.W.2d 721, 722 (Tex.Crim.App. [Panel Op.] 1979); *Campbell v. State*, 571 S.W.2d 161, 162 (Tex.Crim.App.1978). Appellant was originally indicted under the "felony murder" statute, TEX.PENAL CODE ANN. sec. 19.-02(a)(3) (Vernon 1974), which provides in pertinent part:

(a) A person commits an offense if he:

. . . .

(3) commits or attempts to commit a felony, other than voluntary or involuntary manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

*Id.*

The indictment alleges that the underlying felony was theft. Furthermore, the State proved the offense of theft in its attempt to prove murder. Under the circumstances, we find that theft in this case is a lesser included offense of murder.

Having concluded that theft constitutes a lesser included offense, we must now determine whether the trial court erred in refusing to charge the jury on theft. The Court of Criminal Appeals has mandated a two-pronged test for that determination. The first prong, already met, is that the elements of the lesser included offense must be included within the proof necessary to establish the offense charged. *See Godsey v. State*, 719 S.W.2d 578, 584 (Tex. Crim.App.1986). The second prong re-

quires that there be some evidence in the record that if the accused is guilty, she is guilty of *only* the lesser offense. *See id.* Appellant's contention is brought up short by this second prong.

Appellant admits in her brief that the only disputed point is the mental state of the defendant. The only evidence of appellant's mental state is the statement made by the appellant shortly after her arrest and admitted into evidence at trial. In that statement appellant said that she never intended to kill anybody, but it is clear from the rest of the statement that appellant intended to steal from the deceased.

Under the felony murder doctrine,

[T]he culpable mental state for the act of murder is supplied by the mental state accompanying the underlying committed or attempted felony giving rise to the act. The transference of the mental element establishing criminal responsibility for the original act to the resulting act conforms to and preserves the traditional mens rea requirement of the criminal law.

*Rodriquez v. State,* 548 S.W.2d 26, 28–29 (Tex.Crim.App.1977). Thus any evidence of appellant's intent to commit theft was also applicable as intent to commit murder. As such, it could not constitute evidence tending to show that if appellant was guilty, she was only guilty of theft. Appellant's fifth point of error is overruled.

Appellant's sixth through twelfth points of error maintain that the trial court improperly allowed reference to extraneous offenses during voir dire, the guilt/innocence phase of the trial, and the punishment phase of the trial.

■ On voir dire examination by the State, the prosecutor made reference to the habitual offenders statute. At that point, appellant's counsel objected and the objection was sustained. In spite of the trial court's ruling, we hold that to the extent reflected by the record, the State was pursuing a permissible area of inquiry. Where the jury may be called upon to assess pun-

ishment, both the State and the defendant have a right to qualify the jury on the full range of punishment. Thus, it is proper to inform the jury of the range of punishment applicable to an offense which is enhanced by prior felonies. *See Bevill v. State,* 573 S.W.2d 781, 783 (Tex.Crim.App.1978). Appellant's sixth point of error is overruled.

■ In her seventh, eighth and ninth points, appellant asserts that testimony from two police officers contained improper mentions of extraneous offenses, and that the continued mention of these offenses by the State constituted prosecutorial misconduct. Sergeant Dunlap of the Fort Worth Police Department was asked on direct examination about his efforts to identify the appellant. Dunlap replied that he ran a criminal history through the computer. Appellant objected at this point to the mention of any extraneous offenses. On direct examination of Detective Ford by the State, Detective Ford made mention of the fact that appellant told him she used several different aliases. Again, appellant's counsel objected.

The State is entitled to prove the circumstances surrounding the arrest of a suspect. *See Durant v. State,* 688 S.W.2d 265, 267 (Tex.App.—Fort Worth 1985, pet. ref'd). The use of a false name to avoid arrest and identification is such a circumstance, to be accorded strong probative value. *See id.* Appellant's seventh, eighth and ninth points of error are overruled.

In her tenth point, appellant argues that her statement was improperly admitted because it contained references to extraneous offenses. The edited version of the statement (attached hereto as an appendix) stated that appellant's name was Cindy Ann Walker, and that she had used several other false names and birthdates. The statement describes the method that Black had used to administer the "mickey" on previous occasions when she and appellant had worked together. After describing the events leading up to the victim's death in this case, the appellant stated that she and Black had worked their scheme five to ten

times before in Dallas, Fort Worth and Arlington.

■ The circumstances in this case are unusual because the admissibility of the statement turns on the way it is written. We no longer rely on "the mechanistic invocation and application of 'general rules' and their 'exceptions' in determining the admissibility of extraneous acts of misconduct by the accused." *Morgan v. State,* 692 S.W. 2d 877, 879 (Tex.Crim.App.1985). Instead, we look to see whether the extraneous offenses are relevant to a material issue in the case and whether the relevancy outweighs the inflammatory or prejudicial potential. *See id.; see also Williams v. State,* 662 S.W.2d 344, 346 (Tex.Crim.App. 1983).

■ The State was required by the indictment to show that appellant committed an act clearly dangerous to human life (the administration of Lorazepam and Triazolam) while committing felony theft. If the mention of the extraneous offenses were deleted from appellant's statement, the remainder would not be sufficient to show the commission of an offense, either directly or by the law of parties. The extraneous offenses in appellant's statement show that she was working with Black to commit a theft. Under these circumstances, we believe that the admission of the statement was proper because the extraneous offenses were necessarily interwoven into the proof of the elements of the offense. Having found these offenses highly relevant to the material issues of this case, we also find that their potential for inflaming or prejudicing the jury was low. Appellant's tenth point is overruled.

■ Appellant maintains in her final two points that the trial court should have included an instruction in the charge on punishment limiting consideration of extraneous offenses. We note that appellant cites no authority to support these contentions and fails to argue them in her brief. In spite of this absence we have considered these points and reject them. We know of no authority supporting these points. The jury was free to consider all the evidence introduced in the guilt/innocence phase of the trial. We note that no further evidence of these extraneous offenses was introduced during the punishment phase nor were they mentioned during the State's argument on punishment. Appellant's eleventh and twelfth points are overruled.

Appellant's conviction is affirmed.

## APPENDIX

THE STATE OF TEXAS (

THE COUNTY OF TARRANT (

I, CINDY ANN WALKER, prior to making any statement, having been duly warned by DET. JIM E. FORD # 397, the person to whom this statement is made, that: I have the right to remain silent and not make any statement at all, and that any statement I make may be used against me at my trial; any statement I make may be used as evidence against me in court; I have the right to have a lawyer present to advise me prior to and during any questioning; if I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning; I have the right to terminate the interview at any time. Having been informed of these, my rights, and understanding same, I hereby knowingly, intelligently, and voluntarily waive these rights and, not desiring a lawyer, voluntarily choose to make the following statement: MY NAME IS CINDY ANN WALKER AND I WAS BORN ON 010366. I HAVE USED SEVERAL DIFFERENT NAMES. I HAVE USED THE NAMES MICHELLE DERAMUS, MICHELLE BELL, MICHELLE BLACK, SHARON ANN ANDERSON, AND ERICA MARSHALL. I HAVE USED SEVERAL DIFFERENT BIRTH DATES SUCH AS 010366, 010365, and 010364. I DROPPED OUT OF SCHOOL IN THE 10TH GRADE AND I CAN READ AND WRITE.

I HAVE KNOWN SHARON BLACK FOR A LONG TIME AND WE ARE

GOOD FRIENDS. WE HAVE STAYED TOGETHER AND WE HAVE WORKED TOGETHER FOR A LONG TIME     I MET SHARON BLACK ON THE STREETS IN CALIFORNIA     LESS THAN SIX MONTHS AGO ME [AND] SHARON DECIDED TO TRY SOMETHING DIFFERENT.

SHARON GOT THE "MICKYS" SOMEWHERE. I DON'T KNOW WHAT THEY ARE CALLED OR ANYTHING. THE ONES THAT I HAVE SEEN ARE USUALLY SMALL WHITE TABLETS. I HAVE HEARD THAT THERE IS BOTH PILLS AND LIQUID BUT I NEVER SEEN THE LIQUID. SHARON ALWAYS PUTS THE STUFF IN THE JOHN'S DRINK SO I DON'T KNOW IF SHE USES THE LIQUID SOMETIMES OR NOT OR IF SHE CRUSHES THE PILLS UP OR NOT. WHAT WE USUALLY DO IS GO TO A NICE CLUB SOMEWHERE AND WE PICK OUT A GUY THAT STANDS OUT TO US. SOMETIMES I WILL DO THE TALKING AND SOMETIMES SHARON WILL DO THE TALKING.

WE COME ON TO HIM LIKE AS IF HE IS A NICE GUY AND WE LET HIM PICK US UP. THEN WE USUALLY LET THE GUY TAKE US TO A MOTEL. WHEN WE GET TO THE MOTEL I WILL KEEP THE GUY BUSY WHILE SHARON PUTS THE "MICKY" IN THE GUY'S DRINK. AFTER HE GOES TO SLEEP THEN WE WILL TAKE HIS MONEY AND JEWELRY AND LEAVE. LATER ON WE WILL SELL THE JEWELRY TO SOMEBODY ON THE STREET.

ABOUT A WEEK OR SO AGO AFTER VALENTINE'S DAY WE DECIDED TO GO TO ARLINGTON AND DO IT AGAIN WITH SOME GUY. WE HAD DONE THIS BEFORE IN DALLAS SO WE DECIDED TO GO TO ARLINGTON BECAUSE WE FIGURED THAT THERE WOULD BE A LESS CHANCE OF GETTING CAUGHT. I HAD HEARD OF PAZAZZ CLUB IN ARLINGTON AND I HEARD IT WAS A NICE CLUB SO ME AND SHARON DECIDED TO GO

THERE. WE WERE IN A LIME GREEN OLDER MODEL PARK AVENUE. SHARON WAS DRIVING. WE GOT TO THE PAZAZZ CLUB NOT TOO LONG BEFORE CLOSING TIME. THERE WAS THIS GUY THERE THAT STOOD OUT BECAUSE HE WAS DRUNK AND HE WAS LOUD. HE WAS DRINKING AT THE BAR WITH TWO OTHER GUYS. ONE OF THE GUYS HAD A BEARD AND HE SPOKE WITH SOME KIND OF ACCENT AND THE OTHER GUY WAS SORT OF YOUNG LOOKING. WHEN I SAW THE GUY THAT WAS DRUNK AND LOUD I WENT OVER AND STARTED TALKING WITH HIM AND SHARON SAT AT THE BAR. WE WERE BOTH DRINKING CORONA BEER AND THE GUY WAS DRINKING SOME KIND OF MIXED DRINK. THE GUY THAT I TALKED TO WAS IN HIS 30'S AND HE HAD BROWN HAIR AND NO MUSTACHE AND NO HAIR ON HIS FACE. HE SEEMED LIKE A NICE GUY BUT HE WAS DRUNK AND HE WAS REAL OUTSPOKEN. I NOTICED THAT HE HAD ON A BUNCH OF GOLD JEWELRY AND HE WAS SO DRUNK THAT I THOUGHT HE WOULD BE EASY AND SAFE. I STARTED TALKING TO HIM AND HE TOLD ME THAT HE LIVED AT HOME WITH HIS MOTHER AND DAD. SINCE HE LIVED WITH HIS MOTHER AND DAD IT WOULDN'T [BE] COOL TO GO TO HIS HOUSE SO WE DECIDED TO GO TO THE HOLIDAY INN BECAUSE IT WASN'T VERY FAR AWAY. SHARON CAME ALONG TOO

WE ALL LEFT THE CLUB AND I WENT OUT WITH HIM AND GOT IN HIS DARK COLORED CADILLAC EL DORADO. IT WOULDN'T START AND IT WAS A GOOD THING THAT IT WOULDN'T BECAUSE HE WAS TOO DRUNK TO DRIVE ANYWAY. WE ALL GOT IN THE CAR WITH SHARON IN THE LIME GREEN PARK AVENUE AND SHARON DROVE US TO THE HOLIDAY INN IN ARLINGTON NOT FAR FROM THE CLUB. WHEN WE GOT THERE ME AND THE GUY WENT

INSIDE AND WE GOT A ROOM. HE USED A CREDIT CARD TO GET THE ROOM. THE ROOM WAS UPSTAIRS BUT I DON'T REMEMBER THE ROOM NUMBER. AFTER WE GOT THE ROOM WE WENT BACK OUTSIDE AND GOT IN THE CAR AND DROVE BACK TO THE BACK OF THE MOTEL AND PARKED AND THEN WE ALL THREE GOT UP TO THE ROOM. AFTER WE GOT INSIDE WE SAT AND TALKED FOR A WHILE AND THEN ALL OF A SUDDEN HE TOOK OFF ALL OF HIS CLOTHES EXCEPT HIS UNDERWEAR. SHARON AND I LEFT ALL OF OUR CLOTHES [ON]. HE HAD TAKEN A CORONA BEER OUT OF THE BAR WITH HIM AND HE HAD IT WITH HIM. SHARON TOOK THE BEER AND WENT BACK TO THE DRESSING AREA BY THE BATHROOM. SHE POURED THE BEER IN TWO PLASTIC GLASSES THAT WERE KEPT BACK THERE BY THE BATHROOM. SHE CAME BACK INTO THE ROOM AND HANDED ME THE GLASSES AND I TOOK MINE AND HANDED HIS TO HIM. HE DRANK ALL OF IT. SHARON MUST HAVE PUT THE DRUG IN THE BEER WHEN SHE WAS BACK THERE POURING IT INTO THE GLASSES BACK NEAR THE BATHROOM. HE DRANK ALL OF HIS BEER AND ABOUT TEN MINUTES LATER HE PASSED OUT ON THE BED CLOSEST TO THE FRONT DOOR OF THE ROOM. AFTER THE GUY PASSED OUT SHARON PUT THE BEER BOTTLE AND THE TWO PLASTIC GLASSES IN THE TRASH CAN AND SHE GOES OUTSIDE WITH THE TRASHCAN AND MEETS UP WITH A SECURITY GUARD AND SHE GAVE THE TRASHCAN TO HIM AND TOLD HIM TO GO THROW THE TRASH AWAY. THE SECURITY GUARY LEAVES WITH THE TRASH AND COME BACK A FEW MINUTES LATER AND GAVE SHARON THE TRASHCAN BACK. AFTER THE SECURITY GUARD LEFT THEN SHARON TOOK ALL OF THE GUYS JEWELRY OFF. I DON'T REMEMBER WHAT ALL OF THE JEWELRY WAS BUT I DO REMEMBER THAT HE HAD A GOLD RING OF SOME KIND. I DON'T REMEMBER WHAT SHARON DID WITH THE JEWELRY AFTER SHE TOOK IT OFF OF THE GUY. AFTER THAT WE BOTH LEFT THE ROOM.

AFTER WE LEFT WE WENT TO WHERE WE WERE STAYING. I DON'T REMEMBER EXACTLY WHERE WE WERE STAYING THAT NIGHT. A COUPLE OF DAYS AFTER THAT ME AND SHARON AND HER BOYFRIEND EZELL DROVE TO AMARILLO IN THE SAME GREEN PARK AVENUE.

WE DECIDED TO GO TO AMARILLO JUST TO GO SOMEWHERE DIFFERENT. SHARON AND I HAVE DONE THIS SAME THING WITH GUYS BETWEEN FIVE AND TEN DIFFERENT TIMES WE HAVE DONE THIS IN DALLAS, FT. WORTH, ARLINGTON. ABOUT A YEAR AGO I DID THIS SAME THING BY MYSELF IN ARLINGTON BUT I DON'T REMEMBER WHAT BAR I WENT TO AND WHAT MOTEL I WENT TO. I DON'T REMEMBER THE GUY AND I DON'T REMEMBER WHAT I TOOK FROM HIM BECAUSE IT WAS TOO LONG AGO BUT IT WAS ABOUT THE SAME ROUTINE.

THE NIGHT THAT ME AND SHARON WENT TO THE PAZAZZ CLUB IN ARLINGTON I WAS WEARING BLACK AND I THINK THAT I HAD ON THE BLACK SKIRT THAT I AM WEARING NOW. I THINK SHARON WAS WEARING A DRESS. s/s Cindy Ann Walker