Opinion Issued November 20, 2008 










     





In The
Court of Appeals
For The
First District of Texas




NO. 01-06-01136-CR




JACOB EGUIA, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 228th Judicial District
Harris County, Texas
Trial Court Cause No. 970493


 





O P I N I O N

          Appellant, Jacob Eguia, appeals from a judgment convicting him for capital
murder for causing the death of Ruby Elaine Garcia and her unborn child during the
same criminal transaction. See Tex. Pen. Code Ann. §§ 19.02(b)(1), 19.03(a)(7)(A)
(Vernon Supp. 2008). Appellant was sentenced to life in prison, which was the only
possible sentence since the State did not seek the death penalty. See id. §
19.03(a)(7)(A). In twelve issues, appellant contends that the evidence is legally and
factually insufficient to support his conviction, that the trial court erred by denying
his request for an instructed verdict of acquittal of capital murder, and that the trial
court erred by denying his motion to quash the indictment against him. We conclude
the evidence is legally and factually sufficient, the trial court did not err by denying
appellant’s request for an instructed verdict, and the trial court did not err by denying
his motion to quash. We therefore affirm.
Background
          Ruby Elaine Garcia, complainant, was almost eight months pregnant with her
first child. Complainant lived in an apartment with the child’s father, Ray Torres, a
drug dealer. After a baby shower in her honor, complainant spoke on the telephone
to her mother around 10:30 or 11 at night, which was the last contact complainant had
with her family.
          The next morning, having consumed alcohol and cocaine the night before,
appellant and his brother, Isaac Eguia, decided to drive to complainant’s house in a
red Jeep borrowed from their uncle to purchase more cocaine from Torres. Appellant
routinely bought his cocaine from Torres and had a line of credit so he could acquire
drugs without money on hand. 
          According to Isaac, appellant went into Torres’s apartment while Isaac fell
asleep in the Jeep. Isaac was uncertain as to the time they arrived, but around 8:30
or 9:00 in the morning, a resident of the apartment complex noticed a red Jeep parked
near complainant’s apartment. She did not see anyone in it.
          Around 10:30 in the morning, Torres’s sister, Jennifer Marron, attempted to
call complainant on the telephone because the two had plans to visit Torres in jail,
where he had been for several days. When Marron received no answer, she drove to
complainant’s apartment. Marron did not become concerned for complainant’s
safety until her unanswered knocks on complainant’s door were followed by a
“thump” against the door from within the apartment. Marron then called her mother
and complainant’s mother. Approximately five minutes later, appellant opened the
door. His nose was bleeding and his head was sweaty and bloody. Marron, who
knew appellant because they had gone to school together, asked him if he had been
in a fight. He answered in the affirmative and tried to coax Marron inside the
apartment. As she neared the entrance, she saw that “everything was out of place”
and noticed “skidmarks of blood . . . like something was drug [sic] across the floor.”
          Marron backed away from the door, but appellant grabbed her to pull her into
the apartment. Fearing for her life, she managed to free herself from appellant’s grasp
as he tore off her shirt and bra, and then she fled to the opposite end of the apartment
complex, where she jumped into an occupied parked car belonging to a woman she
did not know. Using the woman’s cellular telephone, Marron summoned the police,
her mother, and her boyfriend. Complainant’s mother and stepfather also arrived.
          There are conflicting statements concerning where Isaac was at this time, but
he was somewhere near the apartment when complainant’s stepfather broke the
window adjacent to the front door in order to enter the apartment. Just as the window
broke, appellant leapt from the second-story balcony. When she saw appellant,
Marron noticed that he had changed out of the red plaid shirt he had been wearing
earlier and now had on a gray T-shirt. Marron and her companions punched and
kicked appellant and beat him with a metal baseball bat. Meanwhile, complainant’s
mother and stepfather gained entry into the apartment, where they discovered
complainant’s deceased body. 
          Before police arrived, appellant escaped in the Jeep driven by Isaac. 
Complainant’s father ran to his truck to pursue the brothers but could not find them.
          After Isaac dropped appellant off at their mother’s house, appellant’s wife took
him to the hospital for treatment of injuries he had received. A physician’s assistant
cleaned the blood off appellant’s face and treated three lacerations, one on the
webbed skin of his right hand where his thumb met his palm and two on the inside
of his right leg near his knee. The leg lacerations measured thirty-five and forty-five
millimeters in length. The physician’s assistant testified that lacerations are usually
caused by very sharp instruments like knives or glass. She also remarked that
appellant had “a lot of blood all over his body.” Officers detained appellant at the
hospital.
           DNA analysis confirmed, within a statistical probability, that appellant and
complainant both had each other’s blood on either their person or clothing, and
mixtures of their blood were found in numerous locations around the apartment. One
police officer testified that during knife attacks, it is common for both the assailant
and the victim to be cut and their blood to mix. Except for the master bathroom,
police investigators found blood in every room of the apartment. Through DNA
analysis, investigators located what was positively identified as complainant’s blood
on the soles of appellant’s feet, the interior front doorknob, a blood-soaked pair of
blue jeans, and a seven-inch-long kitchen knife that the assistant medical examiner
found tangled in complainant’s hair. DNA evidence also showed that appellant’s
blood was on numerous surfaces, particularly a new baby crib, Marron’s clothing, and
underneath complainant’s fingernails. 
          Not all of the DNA samples were conclusive. The Medical Examiner’s Office
and an independent molecular biology firm ran DNA tests on the knife. One of the
Medical Examiner’s Office’s tests could not exclude either appellant or complainant
as contributors to the blood on the handle of the knife while the other test indicated
that the handle was covered in blood belonging to both appellant and complainant. 
The independent test conclusively determined that complainant’s blood was on both
the handle and blade, but the test specifically excluded appellant as a contributor to
the DNA sample. The Medical Examiner’s Office’s test of the blade indicated that
appellant’s blood contributed to the mixture, but the statistical certainty of this
conclusion measured considerably lower than the test indicating the presence of his
DNA on the handle.
          Examination for DNA evidence was done on the blood-soaked jeans found near
the largest pool of blood in the apartment. One of the Medical Examiner’s Office’s
tests conclusively identified complainant’s blood on the jeans along with the blood
of a person whose DNA profile was not inconsistent with that of appellant. The other
test by the Medical Examiner’s Office conclusively indicated that both parties’ blood
soaked into the jeans. 
           Investigators discovered two cuts in the denim jeans, located on the front of
the right pant leg. A police officer testified that these cuts were “relatively in the
same size and position” as the lacerations on appellant’s leg. Inside the bloody jeans,
investigators discovered a wallet containing appellant’s driver’s license, social
security card, credit card, and other personal articles. Appellant’s blood was detected
on a purse that contained cash. His blood and complainant’s fingerprint were also
located on a sheet of paper that officers identified as a ledger for drug transactions
that listed twenty-nine names, including “Coco,” with numbers written next to them. 
“Coco” was appellant’s nickname. Within the apartment, investigators found some
cocaine compressed into rocks, a blue pill, some pink powder, $2730 in cash, and, in
the master bedroom closet, approximately twenty-five pounds of marijuana. 
          Complainant died of blood loss as a result of an incised wound to her neck that
severed her right carotid artery and jugular vein. All medical observations indicated
that the pregnancy had been progressing normally and that both complainant and her
unborn child were healthy prior to complainant’s being stabbed. According to the
assistant medical examiner, the unborn child failed to be born alive because of the
maternal death.
          Appellant was indicted for capital murder for intentionally or knowingly
causing the death of complainant and her unborn child in the same criminal
transaction by cutting complainant with a knife. Before trial, appellant filed three
motions to quash the indictment challenging the constitutionality of the Texas Penal
Code. The trial court denied the motions. Appellant pleaded not guilty to the jury. 
The jury convicted appellant of capital murder.
Sufficiency of the Evidence
          Appellant contends in eight issues that the evidence is legally and factually
insufficient to support the jury’s finding of guilt for capital murder. More
specifically, in his first through fourth issues, appellant asserts that the evidence is
legally and factually insufficient to support the jury’s finding of guilt for the murder
of complainant, and in his fifth through eighth issues, he asserts that the evidence is
legally and factually insufficient to support the jury’s finding of guilt for the murder
of complainant’s unborn child. 
          A. Standard of Review
          In a legal sufficiency review, we consider the entire trial record to determine
whether, viewing the evidence in the light most favorable to the verdict, a rational
jury could have found the accused guilty of all essential elements of the offense
beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 318–19, 99 S. Ct.
2781, 2788–89 (1979); Vodochodsky v. State, 158 S.W.3d 502, 509 (Tex. Crim. App.
2005). In conducting our review of the legal sufficiency of the evidence, we do not
reevaluate the weight and credibility of the evidence, but ensure only that the jury
reached a rational decision. Muniz v. State, 851 S.W.2d 238, 246 (Tex. Crim. App.
1993).
          When conducting a factual-sufficiency review, we view all of the evidence in
a neutral light. Ladd v. State, 3 S.W.3d 547, 557 (Tex. Crim. App. 1999). We will
set the verdict aside only if (1) the evidence is so weak that the verdict is clearly
wrong and manifestly unjust or (2) the verdict is against the great weight and
preponderance of the evidence. Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App.
2000). Under the first prong of Johnson, we cannot conclude that a conviction is
“clearly wrong” or “manifestly unjust” simply because, on the quantum of evidence
admitted, we would have voted to acquit had we been on the jury. Watson v. State,
204 S.W.3d 404, 417 (Tex. Crim. App. 2006). Under the second prong of Johnson,
we cannot declare that a conflict in the evidence justifies a new trial simply because
we disagree with the jury’s resolution of that conflict. Id. Before finding that
evidence is factually insufficient to support a verdict under the second prong of
Johnson, we must be able to say, with some objective basis in the record, that the
great weight and preponderance of the evidence contradicts the jury’s verdict. Id. In
conducting a factual-sufficiency review, we must also discuss the evidence that,
according to the appellant, most undermines the jury’s verdict. See Sims v. State, 99
S.W.3d 600, 603 (Tex. Crim. App. 2003).
           “Appellate courts should afford almost complete deference to a jury’s decision 
when that decision is based upon an evaluation of credibility.” Lancon v. State, 253
S.W.3d 699, 705 (Tex. Crim. App. 2008). “The jury is in the best position to judge
the credibility of a witness because it is present to hear the testimony, as opposed to
an appellate court who relies on the cold record.” Id. The jury “may choose to believe
some testimony and disbelieve other testimony.” Id. at 707.
          B. Elements of Capital Murder
          A person commits capital murder when he commits murder under section
19.02(b)(1) of the Penal Code and “murders more than one person . . . during the
same criminal transaction.” Tex. Pen. Code Ann. § 19.03(a)(7)(A) (Vernon Supp.
2008). Under Texas Penal Code section 19.02(b)(1), a person commits murder if he
“intentionally or knowingly causes the death of an individual.” Id. § 19.02(b)(1). “A
person acts intentionally with respect to . . . a result of his conduct when it is his
conscious objective or desire to . . . cause the result.” Id. § 6.03(a). “A person acts
knowingly . . . with respect to a result of his conduct when he is aware that his
conduct is reasonably certain to cause the result.” Id. § 6.03(b).
          In the Texas Penal Code, “‘[p]erson’ means an individual . . . .”; “‘[i]ndividual’
means . . . an unborn child at every stage of gestation from fertilization until birth”;
and “‘[d]eath’ includes, for an individual who is an unborn child, the failure to be
born alive.” Id. § 1.07(a)(26), (38), (49). “It follows from these provisions that a
person who intentionally or knowingly causes the death of a woman and her unborn
child, at any stage of gestation, commits capital murder.” Lawrence v. State, 240
S.W.3d 912, 915 (Tex. Crim. App. 2007). The statute exempts conduct committed
by a woman who chooses to terminate her own pregnancy or by a healthcare provider
terminating the pregnancy of a consenting patient. Tex. Pen. Code Ann. § 19.06
(Vernon Supp. 2008).
                    1. Death of Complainant
          In his first and second issues, appellant asserts that the evidence is legally and
factually insufficient to support the jury’s finding that he intentionally or knowingly
caused complainant’s death. Appellant contends that “at best, the evidence supports
the undisputed fact that he was present in complainant’s blood-soaked apartment
immediately prior to her discovery.” Appellant contends the DNA laboratory report
reveals that appellant’s DNA profile was excluded from the knife identified as the
weapon used against complainant. Appellant points to the lack of any witnesses to
testify that he exhibited or brandished any weapons. He challenges the lack of
evidence to show that he cut his hand on the knife, claiming he cut his hand on
broken glass as he exited the apartment from the balcony. Additionally, appellant
contends there is no evidence of blood splatter on the red shirt he was wearing when
complainant was killed. Appellant also asserts he was cooperative with police
officers. Appellant suggests someone other than him could have committed the
offense, such as the unknown person who called complainant multiple times near the
time she was killed and the unknown people who purchased illegal drugs from
complainant’s apartment. 
                              a. Legal Sufficiency of Evidence 
          Viewing the evidence in a light most favorable to the jury’s verdict, the record
shows that appellant was found inside complainant’s apartment shortly before
complainant was found dead. Appellant was aggressive toward the person who
discovered him in the apartment and fled from the scene when he was discovered
there. See Nunez v. State, 215 S.W.3d 537, 541 (Tex. App.—Waco 2007, pet. ref’d)
(citing Harris v. State, 645 S.W.2d 447, 457 (Tex. Crim. App. 1983)) (finding that
flight from crime scene is circumstantial evidence that points toward guilt). DNA
that matched appellant within a statistical probability was found mixed with
complainant’s DNA in several different rooms throughout the apartment. 
Furthermore, appellant’s wallet was inside a pair of blue jeans that had cuts consistent
with the injuries on appellant’s leg. A witness testified that appellant’s injuries were
consistent with injuries received while attacking someone with a knife. The assistant
medical examiner explained that complainant died as a result of the laceration to her
throat. 
           We conclude, viewing the evidence in a light most favorable to the jury’s
verdict, that the jury could rationally find that appellant knowingly caused the death
of complainant. See Easley v. State, 986 S.W.2d 264, 271 (Tex. App.—San Antonio
1998, no pet.) (holding evidence legally and factually sufficient to support murder
conviction where testimony placed Easley at crime scene, DNA analysis could not
exclude his profile from blood found at crime scene, and expert testimony suggested
cuts on his hands were accidentally self-inflicted as he knifed victim to death). We
overrule appellant’s first issue. 
          Because we have determined the evidence is legally sufficient to show
appellant intentionally caused complainant’s death, we do not reach the alternative
challenges that the evidence is legally insufficient because the evidence does not
prove appellant knowingly caused the death of complainant or intended to cause
serious bodily injury to complainant. We overrule appellant’s third issue.
 
 
                              b. Factual Sufficiency of Evidence
          In his second issue, appellant challenges the factual sufficiency of the evidence
to prove that he murdered complainant. Appellant accurately represents that one of
the results obtained from the independent laboratory excludes him as the source of
the blood found on the knife that was identified as the weapon used against
complainant. However, another test on that knife found appellant’s DNA profile was
not inconsistent with the blood found on the knife. The third test on the knife
identified appellant as a contributor to the blood on the knife handle with a statistical
certainty of 1 in 7,885,000 Hispanic people and the blood on the knife blade with a
certainty of 1 in 125,300 Hispanic people. Due to the disparity of results, the jury
may have accepted the results from all, some, or none of these tests. See Lancon, 253
S.W.3d at 707. We also note that the only object subjected to DNA analysis for
which the three samples produced inconsistent results was the knife found in
complainant’s hair. 
          Appellant accurately points out that no witness testified that he exhibited or
brandished any weapons. Although no witness saw him holding a weapon, a witness
testified that his injuries to his hand and leg were consistent with injuries received
from a sharp object such as a knife. Thus, evidence shows that he was in the
proximity of a knife. 
          Appellant relies on his statement that he cut his hand on broken glass as he
exited the apartment from the balcony. However, evidence shows that he was bloody
while in the apartment before he jumped from the balcony. Marron described
appellant as bloody and sweaty before they fought and testified that she saw the
apartment in disarray. She also mentioned that, in addition to a bloody nose,
appellant had blood on his forehead and in his hair. We also note that if appellant
was injured as he leapt from the balcony, as he claims, that would not explain how
his DNA was mixed with complainant’s DNA throughout the many places the blood
mixture was found in the apartment. Appellant’s DNA was found in most of the
rooms in the apartment and on more than twenty different items. Moreover, at trial,
appellant offered no explanation for the lacerations on his leg. 
          Other evidence is also inconsistent with appellant’s claim that he was injured
on the balcony. The only broken glass that investigators located came from the front
window, which is consistent with Marron’s father’s testimony that he broke the front
window of the apartment when he arrived at the scene. Marron’s testimony also
suggests that appellant did not jump from the balcony until after the glass on the
window by the front door was broken. The sequence of events, therefore, would
dispute appellant’s explanation that any injury to his hand was caused by the window
or balcony. 
          Appellant contends there is no evidence of blood splatter on the red shirt that
Marron initially saw him wearing, which investigators located in appellant’s wife’s
car. Appellant asserts the bloodstain pattern on it was inconsistent with the arterial
spurt pattern that complainant’s severed carotid artery sprayed onto a wall in the
apartment. Although no arterial spray appeared on the red shirt, the jury could have
reasonably determined that appellant positioned himself out of the way of the spray
to avoid the spray, which then hit the wall of the apartment.
          Appellant also asserts he was cooperative with police officers and that there
could be other possible suspects. Appellant suggests someone other than himself
could have committed the offense, such as the unknown person who called
complainant seven times in thirteen minutes beginning at 7:01 on the morning the
body was discovered, and the unknown people who purchased illegal drugs at the
apartment. However, none of the evidence specifically identifies anyone other than
appellant as the murderer. 
          At trial, appellant’s theory of the case was that the twelve hours during which
no one could account for complainant left a measure of doubt too great for the
evidence to prove appellant guilty of murder. The evidence, however, is sufficient
for the jury to determine that appellant was guilty of stabbing complainant’s throat
and intentionally killing her. Investigators found appellant’s blood in more than
twenty locations, including on and around the apartment’s front door, in the kitchen
on the counter and on a coffee can, on one of complainant’s socks, on the purse that
contained most of the cash recovered from the apartment, on an assembled baby crib,
on a sheet of paper found on a couch, on the balcony railing, on appellant’s clothing,
and on Marron’s clothing. Blood that came from both appellant and complainant
saturated the pair of blue jeans found in the apartment that contained appellant’s
wallet. Investigators found the jeans near the largest pool of blood in the apartment,
and it appears someone dragged complainant’s body from that pool toward the front
door where she was found. The correlation between the cuts in the jeans and the
lacerations on appellant’s leg support the inference that he wore those jeans when his
leg was cut. The physician’s assistant, who treated appellant at the hospital,
specifically tended to appellant’s wounds, indicating that the lacerations had been
inflicted recently. Combined with police testimony that knife-wielding assailants
often cut themselves as well as their victims, and evidence that the lacerated appellant
was at the scene of the knife-related murder of complainant, the evidence supports the
conclusion that appellant incurred his lacerations while stabbing complainant. Before
fleeing the scene, he changed out of his bloodied clothes, leaving his wallet inside his
pants. Even if the DNA laboratory report that excludes appellant as a contributor to
the blood on the knife is accurate, the other evidence—such as the recovery of DNA
evidence throughout the apartment, appellant’s wallet in the blue jeans, the physical
injuries to appellant’s body, and appellant’s behavior by fleeing the scene of the
crime—shows appellant’s guilt for the murder of complainant. 
          Providing due deference to the jury’s weighing of the evidence, we conclude
that a neutral examination of the evidence shows that the evidence is not so weak that
the jury’s holding is clearly wrong or manifestly unjust and that the determination of
guilt is not against the great weight and preponderance of the evidence. See Johnson,
23 S.W.3d at 11; see also Easley, 986 S.W.2d at 271. We hold the evidence is
factually sufficient to support the jury’s determination that appellant murdered
complainant by intentionally causing her death. See Johnson, 23 S.W.3d at 11. We
overrule appellant’s second issue. We overrule issue four for the same reasons we
overrule issue three.
                    2. Death of Complainant’s Unborn Child
          In his fifth through eighth issues, appellant contends that the evidence is legally
and factually insufficient to show that he intentionally or knowingly caused the death
of complainant’s unborn child. Appellant contends the evidence is legally and
factually insufficient to prove that appellant knew complainant was pregnant, that he
intended to cause the death of the unborn child, or that he was subjectively aware that
his actions were reasonably certain to cause the result. Appellant asserts that the
State did not prove that he had any knowledge of complainant’s pregnancy and that
it would have been impossible for him to deduce that complainant was pregnant
because she wore loose-fitting clothes that hid her protruding abdomen.
          Appellant emphasizes that the State did not introduce evidence demonstrating
he intentionally caused complainant’s unborn child not to be born alive since
complainant’s abdomen was uninjured. But we need not determine whether appellant
acted intentionally because his guilt for the murder of complainant’s unborn child
may be sustained by evidence that he knowingly caused the death of the unborn child,
which means that he was aware that his conduct was reasonably certain to cause the
unborn child to fail to be born alive. See Tex. Pen. Code Ann. §§ 1.07(a)(26), (38),
(49), 6.03(a), 19.02(b)(1) (Vernon Supp. 2008); Lawrence, 240 S.W.3d at 915.
                              a. Legal Sufficiency of Evidence
          Viewing the evidence in a light most favorable to the jury’s verdict, the
evidence shows that appellant stabbed complainant’s mother while she was four to
six weeks from a full-term pregnancy. By that conduct, according to the medical
examiner, appellant caused the death of both complainant and the unborn child, who
was otherwise healthy. 
          Evidence showed that complainant appeared pregnant. In a photograph of her
taken approximately one month before she died, complainant was noticeably
pregnant. The autopsy report also noted her protruding abdomen, and complainant’s
protruding abdomen is easily visible in the crime scene and autopsy photographs. 
Moreover, the apartment had the crib and other baby-related items strewn throughout
it. We conclude that a rational jury could find that appellant knew complainant was
in the later stages of pregnancy and that stabbing her would cause her unborn child
to fail to be born alive. We hold the evidence is legally sufficient to prove appellant
knowingly caused the death of complainant’s unborn child. We overrule appellant’s
seventh issue. 
          Having determined the evidence is legally sufficient to show that appellant
knowingly caused the death of the unborn child, we do not reach appellant’s fifth
issue that alternatively challenges the evidence the appellant committed an act clearly
dangerous to human life by cutting the mother with a deadly weapon. We overrule
appellant’s fifth issue.
                              b. Factual Sufficiency of Evidence
          In his sixth and eighth issues, appellant maintains that the evidence is factually
insufficient to prove that he murdered complainant’s unborn child. Appellant claims
there is a lack of evidence to show that he knew complainant was pregnant. 
Appellant points to his brother’s testimony that appellant never mentioned or verbally
acknowledged complainant’s pregnancy. However, the jury could have determined
that the brother lacked credibility and disregarded the testimony, or it could have
determined that no comment about the pregnancy was necessary since it was obvious
complainant was pregnant due to her physical appearance. See Lancon, 253 S.W.3d
at 707. 
          The jury had before it photographs that showed complainant’s protruding
abdomen when she was killed, as well as common knowledge about the appearance
of a woman who is near a full-term pregnancy. We also note that the apartment had
many items that a pregnant mother would have and that were readily apparent to
appellant. The unwrapped baby gifts complainant had just received at her baby
shower were in a large open bag just inside the front door. Investigators found
appellant’s blood smeared on a support rail for a fully assembled crib. We conclude
the jury could have reasonably determined appellant knew complainant was nearly
full term in her pregnancy based on her physical appearance.
          Without formally challenging the jury instructions and without citing
authoritative support, appellant asserts that the jury received an instruction to
“presume that Appellant [sic] was aware of complainant’s pregnancy because of his
continuing interactions with her” (emphasis added). On the contrary, the trial court
instructed the jury to “consider the evidence of all relevant facts and circumstances
surrounding the deaths and the previous relationship, if any, existing between
[appellant] and [complainant]” (emphasis added). Thus, the jury was allowed to
consider all the evidence pertaining to any relationship between complainant and
appellant. 
          Viewing all the evidence neutrally, we conclude it is factually sufficient to
sustain the jury’s finding of guilt for knowingly causing the death of complainant’s
unborn child because it is not so weak that the verdict is wrong or manifestly unjust
and the verdict is not against the great weight and preponderance of the evidence. 
See Johnson, 23 S.W.3d at 11. We overrule appellant’s eighth issue. We overrule
appellant’s sixth issue for the same reason we overrule the fifth issue. 
          Appellant did not challenge the jury’s finding that the murders occurred in the
same criminal transaction. We hold the evidence legally and factually sufficient to
support the jury’s finding of guilt for capital murder. 
Instructed Verdict
          In his ninth issue, appellant contends that, because the evidence was legally
and factually insufficient to support the jury’s finding of guilt, the trial court erred by
denying his request for an instructed verdict of acquittal. We construe a challenge to
a trial court’s denial of a motion for instructed verdict as a challenge to the legal
sufficiency of the evidence. See Canales v. State, 98 S.W.3d 690, 693 (Tex. Crim.
App. 2003). Having held the evidence to be legally sufficient, we hold the trial court
did not err by denying appellant’s request for an instructed verdict of acquittal. See
Robinson v. State, 817 S.W.2d 822, 823–24 (Tex. App.—Fort Worth 1991, pet.
ref’d); Bell v. State, 747 S.W.2d 898, 900–01 (Tex. App.—Fort Worth 1988, pet.
ref’d). We overrule appellant’s ninth issue.
Motion to Quash the Indictment
          In his tenth through twelfth issues, appellant contends that the trial court erred
by denying his motions to quash the indictment against him for causing the death of
complainant and her unborn child because the Texas statute that defines an unborn
child as a “person” for purposes of the capital murder statute is unconstitutional. 
          A. Standard of Review
          When reviewing a trial court’s decision to deny a motion to quash an
indictment, we apply a de novo standard of review because the trial court is not in a
better position than the appellate court to make that determination. Lawrence, 240
S.W.3d at 915 (citing State v. Moff, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004)). 
When evaluating the constitutionality of a statute, we initially presume the legislature
has not acted unconstitutionally and the statute is valid. Rodriguez v. State, 93
S.W.3d 60, 69 (Tex. Crim. App. 2002) (citing Ex parte Granviel, 561 S.W.2d 503,
511 (Tex. Crim. App. 1978)). The party challenging the statute has the burden of
establishing its unconstitutionality as applied to him, and in the absence of evidence
supporting the challenge, the presumption of constitutional validity remains in force. 
Id.; Vuong v. State, 830 S.W.2d 929, 941 (Tex. Crim. App. 1992) (citing Parent v.
State, 621 S.W.2d 796, 797 (Tex. Crim. App. 1981)).
          B. First Amendment Challenge
          Appellant asserts that the Texas Penal Code definition of “individual” violates
the First Amendment of the United States Constitution and Section Four of Article
One of the Constitution of the State of Texas. See U.S. Const. amend. I; Tex.
Const. art. I, § 4; Tex. Pen. Code. Ann. § 1.07(a)(26) (Vernon 2007). Because he
bases both of those challenges on the Establishment Clause, it appears appellant is
challenging the statute under Article One, Section Six, of the Constitution of the State
of Texas, which was previously codified under Section Four. Tex. Const. art. I,
§ 6. Appellant asserts that the State’s definition of “individual” “has the effect of
endorsing religion as it is based solely upon a religious belief that life begins at
conception.” 
          The Establishment Clause of the First Amendment of the United States
Constitution prohibits Congress from making any law “respecting an establishment
of religion, or prohibiting the free exercise thereof . . . .” U.S. Const. amend. I. This
prohibition extends to state legislatures via the Fourteenth Amendment. Id. at amend.
XIV; Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 301, 120 S. Ct. 2266, 2275
(2000). The Texas equivalent of the Establishment Clause states, in part, that “no
preference shall ever be given by law to any religious society or mode of worship.” 
Tex. Const. art I, § 6; see HEB Ministries, Inc. v. Tex. Higher Educ. Coordinating
Bd., 235 S.W.3d 627, 642 (Tex. 2007) (finding federal and Texas clauses to be
coextensive in application); see also Williams v. Lara, 52 S.W.3d 171, 186 (Tex.
2001) (implying analyses for federal and Texas clauses are identical). Thus, no
legislature may endorse a religion by enacting a law that supports a religious
organization’s religious message. See County of Allegheny v. ACLU Greater
Pittsburgh Chapter, 492 U.S. 573, 600–01, 109 S. Ct. 3086, 3104–05 (1989). 
          A statute does not violate the Establishment Clause if (1) the statute has a
secular purpose, (2) its principal or primary effect neither advances nor inhibits
religion, and (3) it does not foster excessive government entanglement with religion. 
Lemon v. Kurtzman, 403 U.S. 602, 612–13, 91 S. Ct. 2105, 2111 (1971). Concerning
the first Lemon factor, the State has a legitimate secular interest in protecting mothers
and their unborn children throughout the mother’s pregnancy. Planned Parenthood
of S.E. Pa. v. Casey, 505 U.S. 833, 846, 112 S. Ct. 2791, 2804 (1992); see also
Webster v. Reproductive Health Servs., 492 U.S. 490, 519, 109 S. Ct. 3040, 3057
(1989) (holding State has legitimate interest in protecting potential human life); Roe
v. Wade, 410 U.S. 113, 162, 93 S. Ct. 705, 731 (1973) (holding State has legitimate
interest in protecting lives of pregnant women and human life generally). We
conclude the definition of “individual” serves the State’s legitimate secular interest
in protecting unborn children from the criminal acts of others. See Casey, 505 U.S.
at 846, 112 S. Ct at 2804; Flores v. State, 215 S.W.3d 520, 528 (Tex.
App.—Beaumont 2007, no pet.). 
          A statute is not automatically rendered unconstitutional simply because it
advances ideals that harmonize with religious ideals. Harris v. McRae, 448 U.S. 297,
319-20, 100 S. Ct. 2671, 2689 (noting that Judeo-Christian religions’ forbiddance of
stealing does not preclude state or federal legislatures from outlawing larceny). 
Concerning the second and third Lemon factors, appellant fails to demonstrate how
the statute’s principal or primary effect advances religion, or how the statute fosters
excessive government entanglement with religion. The statute complies with all three
prongs of the Lemon test. See Lemon, 403 U.S. at 612–13, 91 S. Ct. at 2111; see also
Flores, 215 S.W.3d at 428. We hold the statute is valid under the Establishment
Clause of the Constitutions of the United States and the State of Texas. We overrule
appellant’s tenth and eleventh issues.
          C. Eighth Amendment Challenge
          Appellant asserts that the definition of “individual,” when combined with the
definition of “death,” violates the Eighth Amendment of the United States
Constitution. See U.S. Const. amend. VIII; Tex. Pen. Code Ann. § 1.07(a)(26), (49)
(Vernon 2003). Appellant maintains that, by redefining “individual” to include an
unborn child and “death” to include the failure of an unborn child to be born alive,
the legislature has effectually created a new aggravating factor to warrant a capital
murder charge without actually drafting it into the capital murder statute. 
Specifically, he asserts that because “the Texas Legislature [sic] has effectively made
any non-consensual termination of a pregnancy eligible for a capital murder charge”
without writing it into the capital murder statute, the statute is unconstitutional. 
          The Eighth Amendment of the United States Constitution, which applies to the
states via the Fourteenth Amendment, states that “[e]xcessive bail shall not be
required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.” 
U.S. Const. amend. VIII. The legislature has the sole responsibility for defining
crimes and their corresponding punishments. Matchett v. State, 941 S.W.2d 922, 932
(Tex. Crim. App. 1996) (citing Granviel, 561 S.W.2d at 515; State ex rel. Smith v.
Blackwell, 500 S.W.2d 97, 104 (Tex. Crim. App. 1973)). For that reason, the
legislature may expand the list of aggravating factors that justify a capital murder
charge. Id. Appellant offers no support for his argument that, by expanding the
definitions of “person” (through the definition of “individual”) and “death,” the
legislature has violated the constitution. 
          The only authority appellant cites is Furman v. Georgia, which held that
arbitrary, inconsistent, and discriminatory imposition of the death penalty violates the
Eighth and Fourteenth Amendments. Furman v. Georgia, 408 U.S. 238, 239–40, 92
S. Ct. 2726, 2727 (1972). But Texas’s capital murder scheme, which requires a jury
to find a defendant guilty if it finds at least one of the enumerated aggravating
circumstances present, has been held constitutionally valid because “this system
serves to assure that sentences of death will not be ‘wantonly’ or ‘freakishly’ imposed
. . . .” Vuong, 830 S.W.2d at 941 (citing Jurek v. Texas, 428 U.S. 262, 276, 96 S. Ct.
2950, 2958 (1976)). The aggravating circumstance that allows for the imposition of
capital punishment when the defendant commits multiple murders in the same
criminal transaction sufficiently narrows the class of murderers who may be charged. 
Vuong, 830 S.W.2d at 941. The legislature further narrowed the class of murderers
who may be charged by specifically excluding “conduct committed by the mother of
an unborn child” and “a lawful medical procedure performed by a physician or other
licensed health care provider with the requisite consent, if the death of the unborn
child was the intended result of the procedure” or if the procedure was “part of an
assisted reproduction.” Tex. Pen. Code Ann. § 19.06 (Vernon Supp. 2008).
          When the legislature changed the definitions, it also added section 19.06 to the
Penal Code, which provides several ways in which a person can legally cause an
unborn child to fail to be born alive. Id. § 19.06. The legislature appears to have
surveyed the Penal Code and made all the changes it deemed necessary to include
unborn children in the definitions of terms in the penal code. Moreover, the
definition of “individual” has been upheld against an Eighth Amendment challenge
on the grounds of vagueness. See Lawrence, 240 S.W.3d at 915–16. We hold the
definitions of “individual” and “death” do not violate the Eighth Amendment of the
United States Constitution. We overrule appellant’s twelfth issue.
Conclusion
          We affirm the judgment of the trial court.



                                                             Elsa Alcala
                                                             Justice

Panel consists of Justices Taft, Keyes, and Alcala.

Publish. See Tex. R. App. P. 47.2(b).